# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **P.N.A. CONSTRUCTION TECHNOLOGIES, INC., a North Carolina Corporation,** | |
| **Plaintiff,** | |
| **v.** | **1:05-cv-1753-WSD** |
| **McTECH GROUP, INC., a Georgia Corporation, MCDONALD TECHNOLOGY GROUP, LLC, a Georgia Limited Liability Corporation, and STEPHEN F. McDONALD,** | |
| **Defendants.** | |

## ORDER

This matter is before the Court on Plaintiff P.N.A. Construction Technologies, Inc.'s ("Plaintiff") Motion for a Preliminary Injunction [7]. On December 15, 2005, the Court held a hearing on the motion (the "hearing").

## I.    BACKGROUND

Plaintiff P.N.A. Construction Technologies, Inc. ("Plaintiff" or "PNA") moves the Court for a preliminary injunction to enjoin the Defendants, McTech Group, Inc., McDonald Technology Group, LLC, and Stephen McDonald

(collectively the "Defendants"), from infringing United States Patent No. 6,354,760 (the "'760 Patent," attached as Ex. A to Pl.'s Mot. for Prelim. Inj.), which was issued by the United States Patent Office on March 12, 2002.

The '760 Patent relates to a system for transferring loads between cast-in-place concrete slabs for concrete floors. A component of the system is the load transfer plate (the "Plate"). It is the Plate which is the principal focus of the preliminary injunction motion. The Plate is widest at the concrete slab joint and tapers as it extends into the slab. Plates are installed along the edge of adjoining slabs. Their purpose is to allow loads to be transferred from a slab to an adjoining slab while maintaining the integrity of the slabs over which the load is being transferred.[1] Because wet concrete shrinks as it dries, a void is created around each plate installed in the concrete slabs. This void allows movement between adjoining slabs parallel to the longitudinal axis of the joint. This also avoids the slabs binding to each other and allows the slabs to move slightly, permitting loads to be transferred efficiently and without damage to the slabs.

_____

[1] These cast-in-place concrete slab floors are used in large buildings, such as a Home Depot store. In such stores, hard rubber wheel forklifts are frequently used to move goods. The Plates allow these machines to move from concrete slab to concrete slab without the slabs cracking or the slab edges crumbling.

2

The system being sold by Plaintiff is called the Diamond Dowel® system. It uses a diamond-shaped load transfer plate, one of four shapes illustrated in Figure 23 of the '760 Patent. It is the tapering of the Plate end which extends into the concrete which Plaintiff contends facilitates concrete shrinkage around the Plate which, in turn, creates a void allowing movement between adjoining slabs parallel to the longitudinal axis of the joint between the slabs. Plaintiff also contends that this tapering overcomes a substantial problem with prior concrete slab joining systems which were difficult to align properly. Misalignment caused binding and thus failure of adjoining slabs. The '760 Patent system avoids this binding.

Defendants have developed a competing load-transfer system called the EZslide system. The Defendants' system also uses a series of load plates installed in adjoining cast-in-place concrete slabs. The Defendants' load plate shape is similar to the hexagon figure depicted in Figure 23 of the '760 Patent. These two plates are shown below:

3



The portion of Defendants' Plate first embedded in a cast-in-place slab is coated with an elastomeric material with a pliable cushion along the edge of the Plate.  Defendants claim this cushion prohibits the concrete from bonding to the Plate and, along with a tapered edge, enables shrinkage prohibiting the slab from binding and allowing movement between adjoining slabs parallel to the longitudinal axis of the joint.

Plaintiff seeks to enjoin Defendants from continuing to market and sell the EZslide system which Plaintiff alleges infringes the '760 Patent.  Specifically, Plaintiff contends that Defendants' load-transfer plate infringes Claim One of the '760 Patent because it has a "substantially tapered end," as described in Claim One of the patent.  Plaintiff has sent to Defendants correspondence demanding that Defendants cease and desist from infringing the '760 Patent.[2]

---

[2]  The parties agree that Claim One is not literally infringed until Defendants' product is used as a load-transfer system between concrete slabs.  Defendants have

Plaintiff alleges that Defendants' continued contributory infringement will cause Plaintiff to suffer irreparable injury because (i) Plaintiff's system is unique and the only one that addresses the binding and load transfer issues present in past systems, and allowing Defendants to continue to market their system will prohibit Plaintiff from capturing the market share to which it is entitled; and (ii) Defendants' system is inferior in various respects to Plaintiff's system, especially in its installation, and if Defendants are permitted to market their inferior system, potential purchasers will reject the methodology altogether, thus restricting and perhaps eliminating the potential for Plaintiff to sell its system.  Plaintiff claims the balance of hardship and public interest factors also weigh in favor of its requested injunctive relief.

Defendants argue that Claim One of the '760 Patent requires that the edges of the load transfer plate be "substantially tapered," and while the edges of its plate are tapered, they are not tapered "substantially."  Thus, Defendants claim their system does not infringe and Plaintiff cannot otherwise meet the test for issuance of

---

sold at least two of its EZslide systems to third parties who have used it in cast-in-place concrete floors.  Plaintiff also alleges, and Defendants do not contest, that Defendants intend to continue to sell the EZslide system.  Thus, Defendants are alleged to engage in contributory infringement, which Plaintiff seeks to enjoin.

a preliminary injunction.  They claim further that Plaintiff's invention is obvious and that the prior art renders the '760 Patent invalid.

The parties agree that Plaintiff's motion for a preliminary injunction principally requires the Court to evaluate whether Defendants' system infringes Claim One of the '760 Patent; specifically, whether Defendants' plate is "substantially tapered."  If it is not, injunctive relief is not appropriate.

## II.   <u>DISCUSSION</u>

Under 35 U.S.C. § 283, the Court has the power to grant an injunction to prevent the violation of a patent right.  As the moving party, Plaintiff must demonstrate its right to a preliminary injunction in light of four factors:  (1) reasonable likelihood of success on the merits; (2) irreparable harm unless the injunction issues; (3) that the irreparable harm will exceed the harm to the alleged infringer if the injunction issues; and (4) the impact of the injunction on the public interest.  <u>Hybritech, Inc. v. Abbott Labs.</u>, 849 F.2d 1446, 1451 (Fed. Cir. 1988).  "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested."  <u>Id.</u>

A.   <u>Likelihood of Success</u>

To demonstrate a likelihood of success on the merits of its patent infringement claim, Plaintiff must establish it will likely prove that Defendants infringed a valid and enforceable patent.  <u>Pfizer, Inc. v. Teva Pharms. USA, Inc.</u>, 429 F.3d 1364, 1372 (Fed. Cir. 2005).  "An infringement analysis, whether literal or under the doctrine of equivalents, requires two steps:  (1) construction of the claims to determine the scope and meaning of the asserted claims; and (2) comparison of the properly construed claims with the allegedly infringing device."  <u>Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.</u>, 347 F.3d 1314, 1321 (Fed. Cir. 2003); <u>H.H. Robertson Co. v. United Steel Deck, Inc.</u>, 820 F.2d 384, 390 (Fed. Cir. 1987).[3]

1.   *Claim Construction*

In construing claims, a Court examines how a person of ordinary skill in the art would have understood the claim terms at the time of the invention.  <u>Pfizer</u>, 429 F.3d at 1372-73.

---

[3] Conclusive and final construction is not required at the preliminary injunction stage.  <u>Sofamor Danek Group v. Depuy-Motech, Inc.</u>, 74 F.3d 1216, 1221 (Fed. Cir. 1996).

> The inquiry into how a person of ordinary skill in the art
> understands a claim term provides an objective baseline
> from which to begin claim interpretation.  Importantly, the
> person of ordinary skill in the art is deemed to read the
> claim term not only in the context of the particular claim
> in which the disputed term appears, but in the context of
> the entire patent, including the specification.

Id. at 1373 (quotation and citation omitted).  The Court looks initially only at

intrinsic evidence, including the claims themselves, the specification, and the

prosecution history, if it is presented.  Phillips v. AWH Corp., 415 F.3d 1303 (Fed.

Cir. 2005).  "[T]he claims are 'of primary importance, in the effort to ascertain

precisely what it is that is patented.'"  Id. at 1312 (quoting Merrill v. Yeomans, 94

U.S. 568, 570 (1876)).  "[I]t is unjust to the public, as well as an evasion of the law,

to construe [a claim] in a manner different from the plain import of its terms."  Id.

(quotation and citation omitted).  A court should turn to extrinsic evidence only

when the intrinsic evidence is insufficient to establish the clear meaning of the

asserted claim.  Zodiac Pool Care, Inc. v. Hoffinger Indus. Inc., 206 F.3d 1408,

1414 (Fed. Cir. 2000); see Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576,

1582-84 (Fed. Cir. 1996).

"[W]ords of a claim 'are generally give their ordinary and customary

meaning."  Id. (citing Vitronics Corp., 90 F.3d at 1582).  "Ultimately, the

interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelope with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  Phillips, 415 F.3d at 1316.

"Claims must be construed so as to be consistent with the specification, of which they are a part."  Merck & Co., Inc. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1370 (Fed. Cir. 2003).  "[I]t is necessary to consider the specification as a whole, and to read all portions of this written description, if possible, in a manner that renders the patent internally consistent."  Pfizer, 429 F.3d at 1373.  The principal of internal consistency is particularly acute here where the term at issue -- "substantially" -- is used eight (8) times within Claim One.  Indeed, "[a] word or phrase used consistently throughout a claim should be interpreted consistently."  Phonometrics, Inc. v. Northern Telecom, Inc.,133 F.3d 1459, 1465 (Fed. Cir. 1998).  Our examination of the term then must begin with its use in the claim itself, because the usage in these eight (8) instances likely will be instructive, and maybe even controlling, in interpreting the term consistently.  The eight (8) usages are:

1.      "a substantially planar upper surface of the first slab" ('760

        Patent, Col. 6, ll. 66-67.)

2.      "substantially perpedicular to the inner surface of the edge

        form" (<u>Id.</u>, Col. 6, l. 67 - Col. 7, l. 1.)

3.      "a load plate including a substantially tapered end" (<u>Id.</u>,

        Col. 7, l. 5.)

4.      "a load applied to either slab directed substantially perpendicular

        to the upper surface of the first slab" (<u>Id.</u> Col. 7, ll. 8-10.)

5.      "restricts relative movement between the first and second

        slabs in a direction substantially perpendicular to the upper

        surface of the first slab" (<u>Id.</u> Col. 7, ll. 11-14.)

6.      "allowing the first and second slabs to move away from

        each other in a direction substantially perpendicular to the

        inner surface of the edge form" (<u>Id.</u> Col. 7, ll. 15-17.)

7.      "width of the load plate being: substantially greater than

        or equal to the length of the load plate" (<u>Id.</u> Col. 7, ll.

        21-23.)

8.      "Increasingly greater relative movement of the first and

second slabs in a direction substantially parallel to the

longitudinal axis of the joint"  (Id., Col. 7, ll. 26-28.)

The parties agree that the claim construction issue here concerns that portion

of Claim One relating to the dowel plate.  The claim reads:  "a load plate including a

substantially tapered end . . . ."  ('760 Patent, Col. 7, l. 5.)  Plaintiff argues this

portion of the claim should be construed as:  "The end of the load plate has a

gradual diminishing width that is not insubstantial, *i.e.* the diminishing width is large

enough to allow relative movement of two concrete slabs."  (LPR 6.3 Joint Claim

Construction Statement [105] at 2.)  Defendants submit the construction should be:

"An end that is tapered to a large or considerable degree; greatly tapered."  (Id. at

3.)  Defendants have quantified the taper arguing that what is required is a taper of

30 degrees or greater.  (Defs.' Supplemental Opp'n to Pl.'s Mot. for Prelim. Inj. at

7-8.)

The Court has reviewed the patent as a whole, including the specification and

particularly the usage of "substantially" in the eight (8) instances it occurs in  Claim

One.  This usage of the word in Claim One alone strongly supports the  conclusion

that the term "substantially" means "essentially, having the principal characteristic

of."  This construction permits the term to be defined uniformly within the claim

and the patent as a whole, and this construction otherwise makes legal and

functional sense.[4]

The term "substantially" is not uncommon in patents.  "Words of

approximation, such as 'generally' and 'substantially' are descriptive terms

commonly used in patent claims to avoid a strict numerical boundary to the

specified parameter."  Anchor Wall Sys. v. Rockwood Retaining Walls, Inc., 340

F.3d 1298, 1310-11 (Fed. Cir. 2003) (quotation and citation omitted).  To the

extent the term "substantially" has been interpreted to have more than one meaning,

---

[4] To the extent either party urges the Court to rely on extrinsic evidence, including the testimony of the experts who appeared at the hearing, the Court concludes it is unnecessary and impermissible to do so.  Phillips, 415 F.3d 1303; Zodiac Pool Care, Inc., 206 F.3d at 1414.  The intrinsic evidence provides an adequate and compelling basis to interpret the claim.  Moreover, the Court found the testimony the experts presented to be confusing, incomplete and unpersuasive.  In short, it was not helpful in interpreting the claim and only marginally helpful in understanding the systems generally.  Both Mr. McKinney and Mr. Parkes, on behalf of Plaintiff, and Mr. Tarr, on behalf of Defendants, all sought to provide testimony that essentially was their construction of the claim.  To the extent they provided other expert opinion or factual evidence, it was often inconsistent with the intrinsic evidence.  The testimony of Mr. Tarr, who ultimately discredited the position taken by Defendants that the taper angle needed to be 30 degrees or greater to be "substantial," was perplexing.  As the Court has noted, a numerical limit here is not appropriate in light of the intrinsic evidence and the language of the patent as a whole.  That Defendants presented inconsistent constructions to this Court persuades the Court that its reliance on intrinsic evidence and its decision not to rely on extrinsic testimony is sound.

the "cases recognize the dual ordinary meaning of this term as connoting a term of approximation or a term of  magnitude."  <u>Deering</u>, 347 F.3d at 1323.  Choosing between these two descriptive definitions is not difficult here.  The intrinsic evidence urges interpreting the term "substantially" as a term of approximation because this usage makes practical common sense and allows the term to be defined consistently in each instance it is used in Claim One and elsewhere in the patent, including the specification.  Simply substituting the approximation definition proves this definition fits:

1.      [essentially, having the principal characteristic of having

        a] planar upper surface ('760 Patent, Col. 6, ll. 66-67.)

2.      [essentially, having the principal characteristic of being]

        perpendicular to the inner surface of the edge form (<u>Id.</u>,

        Col. 6, l. 67 - Col. 7, l. 1.)

3.      [essentially, having the principal characteristic of having

        a] tapered end (<u>Id.</u>, Col. 7, l. 5.)

. . .

8.      [essentially, having the principal characteristic of being]

        parallel to the longitudinal axis of the joint (<u>Id.</u>, Col. 7, 11.

26-28.)[5]

This construction simply makes logical, legal and linguistic sense.[6]

Thus, using intrinsic evidence, this Court construes the term "substantially tapered end" in Claim One to mean an end which essentially, has the principal characteristic of being tapered. This definition also is consistent with the function of the Plate. The '760 Patent provides that the purpose of the system and the fundamental role played by the Plate is to avoid binding and to allow load transfer by a void being created around the plate so to permit movement parallel to the longitudinal axis. Both parties agree the taper allows this transfer to occur and also avoids binding. Having construed this claim term based on intrinsic evidence, and having tested the construction in its application throughout the '760 Patent, the

---

[5] While the Court has not used extrinsic evidence, it notes that the Court's definition is consistent with the prevailing dictionary definition of the word "substantial." See Blacks Law Dictionary 1428 (6th ed. 1990) ("essentially, without material qualification, in the main."); Webster's Collegiate Dictionary (10th ed. 1999) ("consisting of or relating to substance; important, essential").

[6] The Federal Circuit has stated that "like the term 'about,' the term 'substantially' is a descriptive term commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1367 (Fed. Cir. 2001); Playtex Prods., Inc. v. Procter & Gamble Co., 400 F.3d 901, 904-05 (Fed. Cir. 2005) ("substantially" should not be interpreted as having a strict numerical limitation). A definition based on magnitude cannot be uniformly or consistently applied in this particular patent.

Court concludes PNA has a substantial likelihood of success in proving

Defendants' Plate is substantially tapered and thus literally infringes the '760

Patent.[7] [8]

Under the doctrine of equivalents, the Court's conclusion would be the

same.  "A product or process that does not literally infringe upon the express terms

of a patent term may nonetheless be found to infringe if there is 'equivalence'

between the elements of the accused product process and the claimed elements of

the potential invention."  Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520

U.S. 17 (1997).  Under the doctrine of equivalents, infringement exists if "every

limitation of the asserted claim, or its 'equivalent,' is found in the accused subject

matter."  Ethicon Endo-Surgery v. United States Surgical Corp., 149 F.3d 1309,

1315 (Fed. Cir. 1998).  Where the limitation of a claim -- or its equivalent -- is

--------

[7]  To the extent Defendants contend the Court should limit its construction to
the preferred embodiment described in this patent, the Court declines to do so.
"Claims of a patent may only be limited to a preferred embodiment by the express
declaration of the patentee."  Playtex, 400 F.3d at 908.

[8]  Defendants' argument that the Court should adopt a "greater than 30
degrees taper" is inconsistent with the language of this patent.  When the patent
seeks to impose a numerical limit, it does so.  (See Claim 2 ("less than one-eighth
of a largest width"); Claim 23 ("no less than twice a depth."); Claim 26 ("an angle
of approximately 45 degrees").)

found in the accused product or process and this "equivalent" only insubstantially differs from the claim limitation, the accused product is infringing under the equivalents doctrine.  Id.  "Whether a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result may be relevant to [a doctrine of equivalents] determination."  Id. at 1315-16.

Even if the Defendants' Plate here was not literally infringing, it would be under the doctrine of equivalents.  The evidence presented, including that presented by the Defendants, shows there is substantial similarity, if not substantial conformity, in the plate geometry instructed by the '760 Patent and that employed by the Defendants.  Every iteration of this plate, including as described in the patent language, depicted in Figure 23 of the '760 Patent, and as manufactured by the Defendants, has precisely the same operative features.  The plates all are tapered, flat, embedded in adjoining cast-in-place slabs and -- importantly -- the tapered ends of each enable two functions:  they avoid binding of the slabs due to misalignment and, by contraction of the drying concrete, they allow a void to be created enabling movement parallel to the longitudinal axis of the joint.  The necessary conclusion is that a doctrine of equivalents analysis further supports that

16

Plaintiff has a substantial likelihood of success on the merits.[9]

        2.    *Validity*

Defendants next claim that Plaintiff cannot demonstrate a substantial likelihood of prevailing on the merits because the '760 Patent is invalid. Defendants rely on four (4) prior art references they claim anticipate or render the '760 Patent claims obvious, and thus invalid. The references are: U.S. Patent No. 5,261,194 ("Ceramic Building Blocks") ("'194 Patent"); U.S. Patent No. 3,859,769 ("Interlocking Modules") ("'769 Patent"); U.S. Patent No. 5,623,799 ("Device and Process for Mounting Tiles of Varying Thicknesses") ("'799 Patent"); and U.S. Patent No. 5,261,635 ("Rectangular Plate between Slabs") ("'635 Patent").

"Validity challenges during preliminary injunction proceedings can . . . raise substantial questions of invalidity or evidence that would not suffice to support a judgment of invalidity at trial." Amazon.com, Inc. v. BarnesandNoble.com, Inc., 239 F.3d 1343, 1358-59 (Fed. Cir. 2001). "In resisting a preliminary injunction . . . one need not make out a case of actual invalidity." Id. at 1359.

_____

[9] That the Defendants' plate has an elastomeric covering which aids the lateral movement does not make it unequivalent where Defendants' evidence is that the tapering also is required to allow the "parallel to the longitudinal axis of the joint" movement claimed in the '760 Patent.

> Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial.  The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself.

Id.  The patentee, on its preliminary injunction motion, must "present a clear case supporting the validity of the patent in suit," such as by showing it had "successfully withstood previous validity challenges in other proceedings."  Id.

In their initial pleading opposing Plaintiff's preliminary injunction motion, Defendants dedicate only four (4) pages to their invalidity argument.  (Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. at 13-17.)  A significant portion of these pages are used to reproduce illustrations from the three (3) patents discussed.[10]  Defendants' summary arguments based on these patents are not compelling.[11]  They make the superficial claim that the '194 Patent addresses relative vertical alignment among pavement sections in a dome structure using a diamond-shaped plug.  Defendants do not contend the plugs prevent binding or allow parallel movement along the joint between the sections.  They provide no other comment on how this constitutes prior

---

[10]  The '635 Patent first was discussed in Defendants' Supplemental Opposition to Plaintiff's Motion for a Preliminary Injunction.

[11]  In Defendants' subsequent submissions they simply rehash the cursory arguments they presented in their initial opposition submission.

art here or how it supports their obviousness allegation.  They cite the '769 Patent for its squares or tongues which hold adjacent edges in abutment.  They do not argue this system allows movement between the abutted edges or prohibits their locking in place.  The '799 Patent is cited for its tapered tongue spacer that allows tiles to be aligned in installation.  The spacer performs none of the purposes of the load plate disclosed in this '760 Patent and it is hard to see its relevance here.

At the hearing, Mr. Tarr, Defendants' expert, discussed the '194 patent.  He stated that it was issued in the early 1980's, before the '760 Patent, and that it was a patent for a rectangular bar embedded in adjoining poured slabs to provide load transfer between them.  He did not opine that the plate addressed adjoining slab lock-up and he did not compare how load transfer was achieved or how it informed the '760 Patent.  Additionally, Defendants have not credibly shown that the four (4) patents disclose each and every limitation of Claim One, and the Court's review and discussion of these shows they do not.  Lewmar Marine, Inc. v. Barient, Inc., 827 F.2d 744, 747 (Fed. Cir. 1987).  Even if they did,  Defendants also have not shown that there was a motivation on the part of anyone skilled in the art to combine these purported prior art references so as to render the '760 Patent system obvious.  Uniroyal Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 1051 (Fed. Cir. 1988)

("[T]here must be some reason for the combination [of prior art references] other than the hindsight gleaned from the invention itself.").

Having considered the Defendants' conclusory arguments, including that offered as evidence by witnesses and counsel at the hearing, and having reviewed the '194, '769, '799 and '635 patents themselves, the Court finds Defendants have not established that the '760 Patent's validity is vulnerable or that the patent is obvious.[12]  Thus, the Court finds that Plaintiff has made a clear showing supporting validity of the '760 Patent and thus has a substantial likelihood of prevailing on the merits.

3.    *Miscellaneous Arguments*

Defendants make various other arguments in urging the Court not to issue a preliminary injunction.[13]  These arguments are not persuasive; they are worthy only

---

[12]  The testimony of Defendants' expert was that Plaintiff's system was very innovative.  (Tarr Dep. at 152).

[13]  Defendants argue that the "whereby" clause in Claim One -- that the tapered ends in the joint plate "allow the joint to open" -- is a limitation which Defendants' EZslide system does not meet because the EZslide plate has an elastomeric coating on one-half and it is this coating which allows the joint to open. This is not a compelling argument.  Defendants in their submission and in their presentation at the hearing, acknowledge that the plate configuration -- specifically the tapered ends -- along with the coating allow the joint to open.  Defendants' argument that "it is the elastomeric covering, not the claimed load plate, that allows

of a short discussion.

           a.      <u>Invention was known before the '760 Patent</u>

Defendants claim Messrs. Stallings and Walker came up with the "exact same idea" as the '760 Patent system before the '760 Patent inventors "resumed work on the patent." (Defs.' Supplemental Opp'n to Pl.'s Mot. for Prelim. Inj. at 17.) The "exact same idea" which Defendants claim foreclose the patent was "that a plate with a taper or a different geography would work better than conventional dowels or other load transfer device." (<u>Id.</u> at 17 n.22.) Defendants claim this undisclosed, privately conceived idea, constitutes prior art even though it was unknown to the public. Their argument fails. Prior knowledge, to anticipate a patent, must be public, complete and constitute an adequate description of the inventions. <u>Ecolochem, Inc. v. Southern California Edison Co.</u>, 227 F.3d 1361 (Fed. Cir. 2000). The thoughts expressed by Messrs. Stallings and Walker do not meet this test.

           b.      <u>Mr. Parkes was not properly identified as an inventor</u>

Defendants claim that one who does not contribute to the conception of a

---

the joint . . . to open" is contradicted by the testimony of its principal expert, Mr. Tarr.

claimed invention may not be listed as an inventor in a patent and, if he is, the patent may not be enforced.  Defendants claim Mr. Boxall conceived of the '760 Patent system and that Mr. Parkes only conceived of the installation procedure,  prohibiting him from being listed as an inventor.  That Mr. Parkes was listed as an inventor, Defendants claim, invalidates the patent.

Inventors named on an issued patent are presumed to be correctly listed. Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1994).  Misjoinder arguments, like the one Defendants make here, are not favored. Id. at 1088-89.  To prevail in a misjoinder argument, Defendants must prove misjoinder by clear or convincing evidence.  Eli Lilly Co. v. Aradigm Corp., 376 F.3d 1352, 1358 (Fed. Cir. 2004).  Defendants fall far short of that standard here. The testimony offered by Defendants, read objectively, indicates that Mr. Parkes was involved in the conception of the patented systems -- specifically, the installation procedures.  An inventor need not be involved in conception as a whole. A person may be listed as a patent co-inventor even if he or she "did not make the same type or amount of contribution" or "make a contribution to the subject matter of every claim of the patent."  35 U.S.C. § 116.  Defendants did not meet their burden to show misjoinder and the facts suggest strongly that Mr. Parkes' listing as

a co-inventor was appropriate.

           c.     Napkin argument

Finally, Defendants claim Messrs. Parkes and Boxall violated 35 U.S.C.

§ 102(b) by publically disclosing the invention more than a year before the effective

date of the patent because they drew diagrams of it on restaurant napkins and

placemats while dining at restaurants.  Defendants claim these were invalidating

public disclosures.  Defendants rely on In re Klopfenstein, 380 F.3d 1345 (Fed. Cir.

2004), to support their "back of the napkin" disclosure argument.  In Klopfenstein,

the patentee presented a slide presentation at a trade meeting which disclosed each

limitation of the invention for which he later sought a patent.  The patentee's

presentation was posted and displayed publicly for over two days.  The

presentation then later was displayed at a university.  This extended and descriptive

publication of an invention and its availability to a wide public audience does not

support that a "back of the napkin" drawing at a restaurant constitutes publication

which invalidates a patent.  To claim that it does is, at most, imaginative.

For the reasons stated, Plaintiff has made a proper showing that it has a

substantial likelihood of prevailing on the merits that the '760 Patent is valid and

enforceable.  The Court further finds that its construction of Claim One evidences

that Defendants' EZslide system infringes Claim One.  Plaintiff has met the first

preliminary injunction criterion.

> B.    Irreparable Harm

Plaintiff advances four arguments to establish its irreparable harm:  (i) that

Plaintiff is the exclusive supplier of the patented load transfer system and could lose

prospective or existing contracts to infringing competitors; (ii) Defendants

presumably will compete with Plaintiff at an upcoming trade show for concrete

products; (iii) that Defendants' system may be inferior and "taint" Plaintiff's

product; and (iv) that Home Depot, one of Plaintiff's clients, asked Plaintiff to

review its pricing of its product.[14]  (Pl.'s Mot. for Prelim. Inj. at 31-33; Hearing Tr.

at 76-77.)

A patent owner is entitled to a presumption of irreparable harm if he

establishes a "strong showing of likely infringement of a valid and enforceable

patent."  Pfizer, 429 F.3d at 1381.  The presumption of irreparable harm is

rebuttable.  Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 682-83

---

[14]  There is no evidence or a reasonable inference that the request was in response to Defendants's system).

(Fed.Cir. 1983)  When the presumption of irreparable harm arises, the burden is on the alleged infringer to produce evidence sufficient to establish that the patent owner would not be irreparably harmed by the denial of a preliminary injunction.  Id.; Polymer Techs., Inc., 103 F.3d at 974.

While the patent holder is entitled to the presumption, the Court may consider a variety of factors in determining if the presumption is rebutted.  These factors include the maturity of the field covered by the patent, the competition in the field, the patentee's presence in the field, changes in the technology in the field, research being conducted in the field, whether the patent would assist the holder to establish market position, the value of the patent over time, predictability of injury if the patent is not enforced, whether failure to enjoin will encourage other infringers, whether patentee has engaged in a pattern of granting licenses such that it may be reasonable to expect that the patent right can be compensated by a royalty, the availability of money damages and whether the patentee delayed in bringing suit thereby discrediting irreparability.  See Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1456 (Fed. Cir. 2005); Rosemont, Inc. v. United States Int'l Trade Comm'n, 910 F.2d 819, 821 (Fed. Cir. 1990); High Tech Med. Instrumentation v. New Image Indus., 49 F.3d 1551, 1557 (Fed. Cir. 1995); Polymer Techs., Inc. v. Bridwell, 103 F.3d

970, 974 (Fed. Cir. 1996).

The availability of money damages can rebut the presumption of irreparable harm in appropriate cases.  Nutrition 21 v. United States, 930 F.2d 867, 872 (Fed. Cir 1991).  "The availability of damages is particularly significant when . . . the patentee can point to no specific interest that needs protection through interim equitable relief."  High Tech Med. Instrumentation, 49 F.3d at 1557.  However, "[i]t is well-settled that, because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that money damages will always suffice to make a patentee whole."  Hybritech, 849 F.2d at 1456-57.

Irreparable injury is a difficult issue and a close call here.  While the poured slab on ground industry is not new, the system developed by Plaintiff is concededly innovative.  It overcomes two very basic problems of binding and force transference and the technology in the patent has attracted the attention of significant users of cast-in-place concrete slab floors, including WalMart, Target and Home Depot.  There is no evidence that these large companies intend to use Defendants' system.  In the cast concrete floor industry, the system conceived by Plaintiff is used in only about 10% of the market.  It is uncertain whether and to what extent use of Plaintiff's system will expand and whether Defendants' system will capture a

material share of the market.

To date, Defendants' sales, while limited, appear to be increasing. While Plaintiff's system apparently has significant interest among Plaintiff's distributors, (Hearing Tr. at 72-73), this continued interest is not certain. There is no evidence that Defendants' EZslide system is eroding distributor support or causing a diminution in distributor sales of Plaintiff's system, but it could if their increasing sales continue.

Because there are only two systems like the patented system available in the industry, problems with or inferiority of one could suppress interest in the other. Plaintiff did not present testimony that has occurred, but it did offer an example involving an inferior concrete product manufactured by a competitor adversely affecting the sales of a similar product manufactured by Plaintiff.

The evidence is that Plaintiff has licensed the '760 Patent technology overseas and it has not indicated it will do so in the United States. The record also is that Plaintiff has demanded that Defendants withdraw their EZslide system from the market. Defendants have refused. As discussed above, Plaintiff has made a strong showing of a likelihood of success on the merits sufficient to warrant a presumption of irreparable harm. The question before the Court is whether Defendants have

made a sufficient showing to rebut the presumption.  It is a difficult question.

The market at issue here is small and uncertain.  Defendants claim that their system, even if infringing, is admittedly different from Plaintiff's and, as Plaintiff has noted, it is more difficult to use, its installation is more prone to damage and it otherwise is less reliable and less effective.  Continued sale of it could result in loss of user confidence in the technology generally.  The Court notes that Plaintiff has captured the creme of the market by providing its system to such big box, large cast-in-place concrete floor stores as Home Depot, WalMart and Target.  One or more of these stores now specify that the Plaintiff's system is to be used in construction of their locations.  But it is uncertain whether this level of interest will continue if Defendants' sales continue.[15]  While there is no evidence that Plaintiff has lost any sales to Defendants or that Plaintiff, in this limited market, has or will lose market share, either because of Defendants' product sales or reputational injury caused by Defendants' inferior product, the Defendants' product and marketing is in the process of maturing and sales are continuing to be promoted.

_____

[15]  Plaintiff notes that Home Depot asked Plaintiff to review its pricing of its product.  There is not evidence tying this inquiry to the marketing of Defendants' product, although that possibility exists since Defendants are engaged in concerted marketing, including at the country's largest concrete trade show held this month.

A principal purpose of preliminary injunctive relief is to maintain the status quo.  Under the unique circumstances here, where the irreparable injury presumption is strong and these is some evidence that may rebut it, the Court believes preliminary injunctive relief tailored to the unique facts here best serves the law and the parties.  Specifically, the Court is not inclined to consider granting a comprehensive injunction, especially one that would prohibit Defendants from performing contracts into which it already has entered.  The risk to Plaintiff's patent rights derives, in the Court's view, from continuing sales, and if a preliminary injunction is entered, it ought to apply only to new contracts.  To the extent Defendants have contracts pending, the Court believes an adequate remedy for these limited sales can be fashioned if permanent injunctive relief is entered.   Issuing an injunction only against Defendants entering into new contracts for its  EZslide system is, in the Court's opinion, the best way to maintain the status quo

while allowing Defendants to maintain an income stream to assist in its remaining viable.

The Court notes it has committed to the parties that it intends to process this case to resolution quickly.  It already has collapsed the time for discovery and

offered to advance the date for the Markman hearing, although the parties have declined that offer.

    C.    <u>Public Interest and Balance of Harms</u>

"Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." <u>Hybritech, Inc.</u>, 849 F.2d at 1458. In this case, protection of a patentee's rights protects the parties' and the public's interests. The Court also finds that the harm to Plaintiff's patent interest outweighs the harm of enjoining Defendants' sales, particularly in view of the partial injunctive relief proposed. Thus, the Court finds Plaintiff has met its burden to show it has met the two final criteria for a preliminary injunction.

The Court will require Plaintiff to post a bond to indemnify Defendants for the losses they will suffer from the issuance of this injunction if they ultimately prevail in the suit. Plaintiff does not oppose the issuance of a bond, (Hearing Tr. 184), and the Court will hold a hearing to determine the appropriate amount of such bond.

### III.   <u>CONCLUSION</u>

For the reasons stated above, and having carefully weighed the relief requested,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for a Preliminary Injunction [7] is **GRANTED IN PART** and **DENIED IN PART.**

Defendants are enjoined from entering into contracts to sell their EZslide system, but are allowed to conclude contracts into which they previously entered.

**IT IS FURTHER ORDERED** that the Court will hold a hearing regarding Plaintiff's posting of a bond on February 21, 2006 at 10:00 a.m. in courtroom 1705.

**SO ORDERED**, this 8th day of February, 2006.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE